**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**JERRY GRAYS, 11-b-2432,**

                                        **Plaintiff,**              **13-CV-532-EAW-HKS**

**v.**

**MR. D. McGRAIN, et al.,**

                                        **Defendants.**

---

## REPORT, RECOMMENDATION, AND ORDER

Plaintiff, proceeding *pro se*, commenced this action pursuant to

42 U.S.C. § 1983 on May 17, 2013. Dkt. No. 1. He alleges that while he was

incarcerated at the Elmira Reception Center ("ERC"), he was assaulted by corrections

officers, denied proper medical treatment for his injuries, and threatened when he stated

his intent to sue the officers involved. Dkt. No. 82. This case was referred to the

undersigned by the Hon. Elizabeth A. Wolford, pursuant to 28 U.S.C. § 636(b)(1), for all

pretrial matters and to hear and report on dispositive motions. Dkt. No. 67. Currently

before this Court is the Motion for Summary Judgment filed by defendant P.

Brasalmann, the ERC doctor who treated plaintiff, and defendants R. Manwaring,

H. McAlinn, D. McGrain, and A. Sechrist, all corrections officers at ERC (Dkt. No. 65),[1]

as well as a Motion for Judgment on the Pleadings and/or for Summary Judgment by

---

[1]Defendants' Motion for Summary Judgment (Dkt. No. 65) was filed prior to plaintiff filing
the Amended Complaint (Dkt. No. 82). After reviewing the Amended Complaint, this Court
found that it was nearly identical to the Complaint with the Amended Complaint containing only
a few additional factual allegations against defendant Sechrist. Therefore, in the interest of
judicial economy and upon defendants' request, I agreed to construe defendants' pending
Motion for Summary Judgment (Dkt. No. 65) as against the Amended Complaint (Dkt. No. 82).
Dkt. No. 86.

defendant A. Sechrist (Dkt. Nos. 87).  For the reasons set forth below, it is

RECOMMENDED that defendant Sechrist's Motion for Summary Judgment or for

Judgment on the Pleadings (Dkt. No. 87) be **GRANTED**, and defendant Brasalmann,

Manwaring, McAlinn, McGrain, and Sechrist's Motion for Summary Judgment (Dkt. No.

65) be **GRANTED IN PART** and **DENIED IN PART**.


## BACKGROUND

The following facts are taken from the Statement of Undisputed Facts

submitted by defendants Brasalmann, Manwaring, McAlinn, McGrain and Sechrist (Dkt.

No. 65-2), the Statement of Undisputed Facts submitted by A. Sechrist (Dkt. No. 87-2),

Plaintiff's Response in Opposition to Motion for Judgment on the Pleadings and/or For

Summary Judgment (Dkt. No. 99), as well as the Amended Complaint (Dkt. No. 82).


*The Alleged Assault*

Plaintiff was taken into custody of the New York State Department of

Corrections and Community Supervision ("DOCCS") on August 9, 2011.  Dkt. No. 65-2,

¶ 29.  After his conviction, plaintiff was initially sent to ERC from the Otswego County

Jail.  Dkt. No. 65-2, p. 3.  Plaintiff alleges that the corrections officers ("COs") at ERC

erroneously believed that he was a pedophile, when, in fact, he was commencing his

sentence for conspiracy to commit murder.  Dkt. No. 82, ¶¶ 46-48.  On the evening of

August 30, 2011, some of the inmates on plaintiff's company were causing a ruckus.

Dkt. No. 65-2, ¶ 9.  Defendant CO McGrain, responded to the disturbance, observed

plaintiff at the door of his cell, wrote something on a piece of paper, and left.  Dkt. No.

65-2, ¶ 10.  Ten minutes later, plaintiff alleges, McGrain returned with a garbage can

filled with cold water, and used a bucket to throw water on plaintiff and his belongings, while screaming profanities and threatening him.  Dkt. No, 65-2, ¶ 12.   Specifically, McGrain threatened to "pummel" plaintiff if he came to breakfast the next morning.  Dkt. No. 65-2, ¶ 14.

Plaintiff alleges that the following morning, August 31, 2011, when he was walking to the mess hall for breakfast, CO McGrain, CO Manwaring and other unidentified officers slapped, kicked, punched, and threw him on the ground, while CO McAlinn watched.  Dkt. No. 65-2, ¶¶ 15-16.  This assault resulted in a large gash just below plaintiff's right knee, which bled and saturated plaintiff's pant leg.  Dkt. No. 65-2, ¶ 17; Dkt. No. 82, ¶ 35.  CO McGrain ordered plaintiff to return to his cell, not allowing him to go to breakfast.  Dkt. No. 65-2, ¶ 18.

Plaintiff testified that he spent the day in his cell and was only allowed to go to the infirmary after the 3 p.m. shift change, when different officers came on duty on his company.  Dkt. No. 65-2, ¶ 19.  Plaintiff alleges that he was threatened that he would not get medical attention unless he agreed to "lie" that he was injured by falling in his cell.  Dkt. No. 82, ¶¶ 40-42.  An unidentified CO escorted plaintiff to the infirmary at approximately 5 p.m., and told CO Sechrist, who was assigned to the infirmary, that plaintiff had fallen.  Dkt. No. 65-2, ¶¶ 20-21; Dkt. No. 82, ¶ 42.  When plaintiff told an inmate porter that he had in fact been assaulted by some COs, Sechrist told plaintiff to "watch his mouth" and that, "comments like that can get you hurt or killed around here." Dkt. No. 65-2, ¶¶ 22-23; Dkt. No. 82, ¶ 43.

-3-

*Medical Treatment*

Once in the infirmary, plaintiff was examined by Nurse Talada who noted a 3 & ½ inch by 1 & ½ inch laceration on plaintiff's right knee.  Dkt. No. 65-2, ¶ 25.  The nurse cleansed the wound with antiseptic soap, applied bacitracin, and wrapped plaintiff's knee in gauze.  Dkt. No. 65-2, ¶ 27.  She advised plaintiff that he would be taken to an outside hospital to stitch the laceration.  Dkt. No. 65-2, ¶ 28. Plaintiff alleges that after his cut was cleaned, CO Sechrist and another unidentified CO escorted him to a holding area to await transport to an outside hospital.  Dkt. No. 65-2, ¶ 29; Dkt. No. 82, ¶ 53.  Sechrist advised the other CO that plaintiff had told an inmate that he had been assaulted by COs, and stated to plaintiff, "You must not want to get out of here alive, keep your mouth shut."  Dkt. No. 65-2, ¶¶ 30-31; Dkt. No. 82, ¶ 53. Plaintiff was never transported to an outside hospital, but placed in a holding cell, and then taken back to the infirmary for the night.  Dkt. No. 65-2, ¶ 32; Dkt. No. 82, ¶¶ 54, 55.  Apparently, Dr. Brasalmann, the ERC doctor, decided to staple plaintiff's knee the following day and  concluded that plaintiff did not need to go to an outside hospital that evening.  Dkt. No. 65-2, ¶ 33.  The nurse advised plaintiff that Dr. Brasalmann would see him in the infirmary the next morning and gave plaintiff medication for his pain.  Dkt. No. 65-2, ¶¶ 34-35.

The following day, September 1, 2011, at approximately 2 p.m., plaintiff was seen by Dr. Brasalmann.  Dkt. No. 65-2, ¶ 38.  At that time, plaintiff told Dr. Brasalmann that he had been assaulted by three COs the previous morning and, despite being seriously injured, was not allowed to come to the infirmary until the

-4-

afternoon.  Dkt. No. 65-2, ¶ 39.  Dr. Brasalmann referred the alleged assault to the

Nurse Administrator.  Dkt. No. 65-2, ¶ 40.  According to the medical records,

Dr. Brasalmann noted a seven centimeter flap laceration below plaintiff's patella but

noted that plaintiff was able to ambulate, had good range of motion, and showed no

signs of infection.  Dkt. No. 65-2, ¶¶ 41-42.  Dr. Brasalmann cleansed plaintiff's wound

with saline, used eleven staples to close the cut, once again cleaned the cut, applied

bacitracin to it and wrapped plaintiff's knee with gauze.  Dkt. No. 65-2, ¶¶ 43-44.

Dr. Brasalmann ordered the staples removed in eight days and directed that the

bandage be checked the following day.  The doctor also gave plaintiff a knee brace to

keep his knee immobilized as well as medication for pain.  Dkt. No. 65-2, ¶ 47.  To

prevent infection, Dr. Brasalmann told plaintiff to keep the wound clean and to take

block showers.  Dkt. No. 65-2, ¶ 46.


Plaintiff was kept in the infirmary for the next few days to keep him from

walking and bending his knee too much.  Dkt. No. 65-2, ¶ 48.  Dr. Brasalmann ordered

that during his stay in the infirmary, plaintiff's vital signs be taken every day, dry

dressings applied to his knee regularly, and that plaintiff rest his knee as much as

possible.  Dkt. No. 65-2, ¶ 50.  Plaintiff's dressing was changed on September 2, 2011,

and he was encouraged not to bend his knee too much.  Dkt. No. 65-2, ¶ 51.  During his

time in the infirmary, plaintiff was seen by Dr. Brasalmann, a Nurse Practitioner, and

multiple other nurses.  Dkt. No. 65-2, ¶ 57.  A nurse checked on plaintiff's knee, and

redressed and put ointment on the wound from time to time as directed by Dr.

Brasalmann.  Dkt. No. 65-2, ¶ 56.  Medical staff observed no problems with plaintiff's

knee or signs of infection on September 3, 4, or 5.  Dkt. No. 65-2, ¶ 52, 57.

Dr. Brasalmann examined plaintiff on September 6, and, noting that plaintiff's wound

was well healed and that his gait was good, discharged him from the infirmary that

same day.  Dkt. No. 65-2, ¶¶ 52-55.

Shortly after plaintiff was discharged from the infirmary, his knee

developed an infection.  Dkt. No. 65-2, ¶ 58.  Plaintiff returned to the infirmary and was

prescribed an antibiotic, Kelflex, which took care of the infection.  Dkt. No. 65-2, ¶ 60.

Plaintiff's staples were removed on September 12, 2011, ointment applied, and

plaintiff's knee wrapped.  Dkt. No. 65-2, ¶¶ 61, 63.  The laceration of plaintiff's knee was

healed when the staples were removed.  Dkt. No. 65-2, ¶ 64.  Since the day his staples

were removed, plaintiff has required no treatment for his right knee.  Dkt. No. 65-2, ¶ 66.

Plaintiff was transferred to Clinton Correctional Facility on October 4,

2011.  Dkt. No. 65-2, ¶ 66.  Plaintiff was seen several times by medical personnel at

Clinton, and no complaints about his knee were noted.  Dkt. No. 65-2, ¶ 67.

*Plaintiff's Attempt to File A Grievance*

Plaintiff alleges that when he was first taken to the infirmary, he told Nurse

Talada that he had been assaulted by corrections officers.  Dkt. No. 87-2, ¶ 10.  At that

time, Sergeant Muccigrosso came to see plaintiff.  Dkt. No. 87-2, ¶ 11.  Plaintiff advised

the Sergeant that he wanted to press criminal charges against the officers who

assaulted him and file a lawsuit against them.  Dkt. No. 87-2, ¶¶ 13-14; Dkt. No. 82, ¶¶

50-51.  According to plaintiff, the Sergeant took pictures of plaintiff's injuries and, when plaintiff refused to go along with the story that he had fallen in his cell, decided to "put Plaintiff in the infirmary to protect him."  Dkt. No. 82, ¶ 50-52.

On or about the following day, September 1, 2011, plaintiff asked CO Sechrist for a grievance form, which she refused to provide.  Dkt. No. 87-2, ¶ 15. Plaintiff wrote out his complaint detailing his assault by the corrections officers on lined paper and gave it to CO Sechrist on her next round.  Dkt. No. 87-2, ¶ 16.  The following day, CO Sechrist returned the complaint to him with a handwritten statement to the effect that the grievance had been denied for insufficient evidence.  Dkt. No. 87-2. ¶ 17. Plaintiff wrote on the grievance form that he did not accept the finding, signed and returned it to CO Sechrist and asked her "to send the grievance on to the next level." Dkt. No. 87-2, ¶ 18.  Plaintiff never saw the grievance again.  Dkt. No. 65-2, ¶ 72.

Plaintiff was transferred from ERC approximately one month following these events.  Dkt. No. 65-2, ¶ 66.  Aside from the grievance that plaintiff alleges that he gave to CO Sechrist, plaintiff did not file any grievances while at ERC.  Dkt. No. 65-2, ¶ 78.  Plaintiff specifically admits that he never filed a grievance regarding the medical treatment he received from Dr. Brasalmann, because he believed that medical claims were non-grievable.  Dkt. No. 65-2, ¶ 79.  After his transfer to Clinton, plaintiff wrote to the Governor and the Inspector General detailing how he was assaulted by Corrections Officers at ERC.  Dkt. No. 87-2, ¶ 21.

## DISCUSSION AND ANALYSIS

**Judgment on the Pleadings Standard**

In deciding a Rule 12(c) motion, courts "employ[ ] the same standard applicable to dismissals pursuant to Fed.R.Civ.P. 12(b)(6)."  *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).  That is, the court accepts all factual allegations in the complaint as true and draws all reasonable inferences in plaintiff's favor.  *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009).  "To survive a Rule 12(c) motion, [plaintiffs'] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 43-44 (internal citation and quotation marks omitted) (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

**Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a *pro se* plaintiff."  *Thomas v. Irvin*, 981 F. Supp. 794, 798 (W.D.N.Y. 1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise."  *Bryant*, 923 F.2d at 982 (internal citations omitted).  A party seeking to defeat a motion for summary judgment:

> must do more than make broad factual allegations and invoke the appropriate statute.  The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

## 42 U.S.C. § 1983

Plaintiff brings his complaint under 42 U.S.C. § 1983, which provides a civil claim for damages against "[e]very person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.  "Section 1983 itself creates no substantive rights; it provides only a

procedure for redress for the deprivation of rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (internal citations omitted). To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must establish that a person acting under color of state law deprived him of a federal right. *Id.* Here, plaintiff claims that defendants violated his rights under the First and Eighth Amendments to the Constitution of the United States. Dkt. No. 82.

**Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act ("PLRA") mandates that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.'" *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009) (*quoting Porter v. Nussle*, 534 U.S. 516, 532 (2002)). To determine if a plaintiff has properly exhausted his claims, a court must "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *Espinal*, 558 F.3d at 124 (*citing Jones v. Bock*, 549 U.S. 199, 218 (2007)).

Acknowledging the "real-world workings of prison grievance systems," a prisoner's failure to exhaust may be excused when the remedy is not available in practice even if it is "officially on the books." *See Ross v. Blake*, 136 S.Ct. 1850,

1858-59 (2016). In this regard, "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 136 S.Ct. at 1859 (*quoting Booth*, 532 U.S. at 738). According to the United States Supreme Court, a grievance procedure is "unavailable" and need not be exhausted under three kinds of circumstances: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) when the grievance procedure is "so opaque that it becomes, practically speaking, incapable of use;" or (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* 136 S.Ct. at 1859-60; *Williams v. Correction Officer Priatno*, 829 F.3d 118, 122-24 (2d Cir. 2016).

The failure to exhaust administrative remedies is an affirmative defense and not a pleading requirement. *Jones*, 549 U.S. at 215 (holding that an inmate need not specially plead or demonstrate exhaustion in the complaint); *Jenkins v. Haubert*, 179 F.3d 19, 28-29 (2d Cir. 1999). As such, "defendants bear the initial burden of establishing, by pointing to legally sufficient source[s] such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffold County Sheriff's Dept*., 788 F.3d 54, 59 (2009). "If the defendants meet this initial burden, administrative remedies may nonetheless be deemed unavailable if the plaintiff can demonstrate that other factor – for example,

threats from correction officers – rendered a nominally available procedure unavailable as a matter of fact." *Hubbs*, 788 F.3d at 59 (internal citations omitted).

Turning to the facts of this case, at the time relevant to this action, DOCCS had a three-tiered grievance system set forth in 7 NYCRR § 701.5.  This was the grievance system, called the Inmate Grievance Program ("IGP"), that was in place at ERC.  Under DOCCS' IGP, an inmate must file a grievance within 21 days of an alleged incident.  7 NYCRR § 701.5(a)(1).  The Inmate Grievance Review Committee ("IGRC") must then review and resolve the grievance within 16 days, conduct hearings if necessary, and issue a written decision within 2 days of the hearing.  7 NYCRR §§ 701.5(b)(2), 701.5(a)(3), 701.5(a)(4).  If an inmate is dissatisfied with the IGRC's determination, he or she can file an appeal with the facility's superintendent within seven working days.  7 NYCRR § 701.5(b).  Further appeal is made to the Central Office of Review Committee ("CORC") within seven working days of the inmate receiving the superintendent's decision.  7 NYCRR § 701.5(c)(1).  CORC must issue a decision within 45 days of the superintendent's decision.  7 NYCRR § 701.5(d)(3)(i).  Only those agents or agencies outside of DOCCS are excluded from the IGP. 7 NYCRR § 701.3(f).

This Court finds that an administrative remedy was "officially on the books" in that ERC operated an IGP at the time of plaintiff's detention.  Dkt. No. 88-1. However, the question remains whether this grievance process was in fact "available" to plaintiff.  Plaintiff alleges, and defendants do not dispute, that he gave CO Sechrist his

grievance relating to his alleged assault, asked her to take it to the "next level," and that

he never saw the grievance again.  Dkt. No. 87-2, ¶ 19.  Drawing all reasonable

inferences in plaintiff's favor, as I must, I find that CO Sechrist never filed plaintiff's

grievance.  Under such a circumstance, "the regulations do not adequately outline the

process to appeal or otherwise exhaust administrative remedies."  *Williams*, 829 F.3d at

124.  In this regard, "the [DOCCS'] process to appeal an unfiled and unanswered

grievance is prohibitively opaque, such that no inmate could actually make use of it."  Id.

at 126.

 Furthermore, as the Second Circuit Court of Appeals held in *Williams*, a

case directly on point with this one, where a prisoner plaintiff is transferred weeks after

unsuccessfully attempting to file a grievance, it may become a practical impossibility[2] for

him to properly exhaust his administrative remedies:

> [E]ven if the regulations . . . , as applied to a prisoner in
> [plaintiff's] situation, were not already 'so confusing' that 'no
> ordinary prisoner can discern or navigate [them],' *Ross*, 136
> S.Ct. at 1859, their obscurity was compounded by the fact
> that [plaintiff] was transferred to another facility
> approximately two weeks after giving his grievance to the
> correction officer. Defendants contend that a transfer does
> not affect an inmate's ability to appeal his grievance to the
> next step, pointing to a provision in the regulation that
> provides: "If the [transferred] grievant wishes to appeal, he or
> she must mail the signed appeal form back to the IGP

---

[2]The practical impossibility of navigating the grievance process under such
circumstances is made clear by plaintiff's unsuccessful attempts after his transfer from ERC to
get a copy of the grievance he gave to CO Sechrist and determine the outcome.  In response to
plaintiff's FOIL request to ERC, the IGP reported, "PER MR. ABRUNZO[,] THERE ARE NO
GRIEVANCES ON FILE."  Dkt. No. 82, ¶ 69.  Plaintiff thereafter sent a FOIL request to Clinton
Annex, where he had been transferred.  The appropriate parties at Clinton Annex advised
plaintiff, "MUST F.O.I.L ELMIRA FOR A COPY OF THE GRIEVANCE," which he had already
done.  Dkt. No. 82, ¶ 69.

> supervisor at the facility where the grievance was originally
> filed within seven calendar days after receipt." NYCRR tit. 7,
> § 701.6(h)(2). However, this provision presumes not only
> that the grievance was actually filed, but also that the inmate
> received an appeal form that he can sign and mail back. The
> regulations plainly do not provide guidance on how a
> transferred inmate can appeal his grievance with the original
> facility without having received a response.

*Williams*, 829 F.3d at 126.

For the foregoing reasons, with respect to the grievance that plaintiff

attempted to file with CO Sechrist, this Court finds that the DOCCS' grievance

procedures that were technically available to plaintiff at ERC were "so opaque and

confusing" that they were, "practically speaking, incapable of use." *Ross*, 136 S.Ct. at

1859; *Williams*, 829 F.3d at 126.  And that, in giving his grievance alleging his assault to

CO Sechrist, plaintiff exhausted all administrative remedies that were available to him.

42 U.S.C. § 1997e(a).

The same cannot be said of plaintiff's medical claim.  It is undisputed that

plaintiff failed to file any grievance relating to his medical treatment because he believed

that such claims were non-grievable.  Dkt. No. 65-2, ¶ 79.  This is not the case.  As

defendants point out, only claims against persons or agencies outside of the DOCCS

system, such as medical contractors, are excluded from the requirements of the IGP.

7 NYCRR § 701.3(f).  Dr. Brasalmann, a DOCCS' physician (Dkt. No. 65-3, ¶ 1), is not

"an entity [or person] not under the supervision of the Commissioner" and "not within the

jurisdiction of the IGP."  7 NYCRR § 701.3(f).  That being the case, plaintiff was required

to exhaust his remedies against Dr. Brasalmann, which he did not.  This failure is fatal

to plaintiff's claim regarding his medical treatment, and defendant Brasalmann is

therefore entitled to summary judgment on this claim.


**First Amendment Retaliation Claim Against Officer Sechrist**

The First and Fourteenth Amendments protect prison inmates who file

grievances from retaliation by prison officials, and such retaliation is actionable under

42 U.S.C. § 1983.  *Rodriguez v. McClenning*, 399 F. Supp. 2d 228, 236 (S.D.N.Y.

2005).  However, because claims of retaliation can be invoked with "relative ease,"

*Cannon v. Wood*, No. 9:10-CV-01332 (GTS/RFT), 2013 WL 838299, at *4-6 (N.D.N.Y.

Jan. 22, 2013), *report and recommendation adopted*, No. 9:10-CV-1332 (GTS/RFT),

2013 WL 838294, at *3 (N.D.N.Y. Mar. 6, 2013), courts should examine such claims

"with skepticism and particular care."  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.

1995) (citation omitted); *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (stating that

"virtually any adverse action taken against a prisoner by a prison official – even those

otherwise not rising to the level of a constitutional violation – can be characterized as a

constitutionally proscribed retaliatory act"), *overruled on other grounds by Swierkewicz*

*v. Sorema*, 534 U.S. 506 (2002); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d

Cir. 1996).


To establish a First Amendment retaliation claim, an inmate must

show that:  (1) he was engaged in constitutionally protected activity; (2) the defendant

took adverse action against the plaintiff; and (3) there was a causal connection between

the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity.  *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004).  The plaintiff bears the initial burden to show that a defendant's actions were improperly motivated.

"Adverse action" is retaliatory conduct "that would deter a similarly situated individual of ordinary firmness" from exercising his constitutional rights. *Barrington v. New York*, 806 F. Supp. 2d 730, 745 (S.D.N.Y. 2011) (internal citations omitted).  If it would not, the retaliatory act is "*de minimis* and therefore outside the ambit of constitutional protection."  *Dawes*, 239 F.3d at 493.  In deciding whether particular conduct constitutes adverse action, courts should bear in mind that "[p]risoners may be required to tolerate more . . . than average citizens, before a [retaliatory] action taken against them is considered adverse."  *Mateo v. Fischer*, 682 F. Supp. 2d 423, 433-34 (S.D.N.Y. 2010).

Plaintiff contends that CO Sechrist retaliated against him for stating that he intended to file a civil complaint and press criminal charges against the other officers by threatening him and then refusing to file his grievance.  Dkt. No. 82, ¶¶ 50-68.  Even assuming for the sake of argument that stating an intent to file a criminal or civil action against DOCCS employees is protected activity,[3] this Court finds that Sechrist's conduct

---

[3]It is unclear whether a prisoner stating that he intends to sue or report DOCCS' employees to the police constitutes "protected activity" because "[h]oping to engage in constitutionally protected activity is not itself constitutionally protected activity."  *Henry v. Dinelle*, No. 9:10-CV-0456 GTS/DEP, 2011 WL 5975027, at *7 (N.D.N.Y. Nov. 29, 2011) (internal citations omitted) (stating that "the Court has trouble finding that an inmate's one-time making of an oral statement (immediately after the use of force against him) that he would be 'contacting [his] attorney,' or 'calling a lawyer' at some unidentified point in the future constitutes engagement in activity that is protected by the First Amendment—especially where, as here, the inmate did not reference the prison grievance process in his statement").  As there is an alternative basis to grant summary judgment in defendants' favor on plaintiff's retaliation claim, this Court need not reach this issue.

was not sufficiently adverse to "deter a similarly situated individual of ordinary firmness" from exercising his constitutional rights.  *Barrington*, 806 F. Supp. 2d at 745 (internal citations omitted).

As noted in my prior Report and Recommendation (Dkt. No. 68), which was adopted by Judge Wolford (Dkt. No. 78):

> [W]hile some verbal threats can constitute adverse action, numerous district courts within the Second Circuit have held that nebulous or vague threats of violence, such as the ones alleged here, are insufficient to establish a First Amendment retaliation claim.  *See, e.g., Keitz v. Kickbush*, No. 13-CV-6284 CJS, 2015 WL 1579228, at *3 (W.D.N.Y. Apr. 9, 2015) (holding that a deputy's conduct in screaming at prisoner plaintiff "[I]'m not afraid to fight, in fact . . . I'll kick your . . ." while approaching plaintiff in a menacing manner with fists clenched was insufficient to support a constitutional violation); *Carl v. Griffin*, No. 08 Civ. 4981, 2011 WL 723553, at *5 (S.D.N.Y. Mar. 2, 2011) (holding that "[d]efendants' alleged 'threats' and/or 'harassment' of Plaintiff were also insufficiently direct or specific to deter an ordinary inmate from exercising his first amendment rights"); *Rosales v. Kikendall*, 677 F. Supp. 2d 643, 648 (W.D.N.Y. 2010) (holding that "verbal harassment, or even threats, are generally held not to rise to the level of adverse action that will support a First Amendment retaliation claim") (citing *Cabassa v. Smith*, No. 08 Civ. 480, 2009 WL 1212495, at *7 (N.D.N.Y. Apr. 30, 2009)); *Mateo*, 682 F. Supp. 2d at 432-33, 434 (finding no "adverse action" where corrections officer twice threatened inmate with physical violence for writing grievances, including one incident where the officer entered the inmate's cell, "held his right gloved fist [to the inmate's] face, [and] threatened [him] by saying that one day he and [the inmate-plaintiff] would party").
>
> Even assuming that plaintiff engaged in constitutionally protected activity by complaining to another inmate that COs had beat him up, Sechrist's threats are not sufficiently "adverse" to state a retaliation claim under 42 U.S.C. § 1983.  The "opacity" of Sechrist's alleged threats to plaintiff – "comments like that can get you hurt or killed around here" and "you must not want to get out of here alive" (Dkt. #33, ¶¶ 43, 53) – "softens the deterrent effect considerably" and removes them from the realm of actionable conduct.  *Mateo*, 682 F. Supp. 2d at 434 (reasoning that "[t]he less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights"); *see also Kemp v. LeClaire*, No. 03-0844, 2007 WL 776416, at *15 (W.D.N.Y. Mar. 12, 2007) (holding that threats like "your day is coming," "you'll be sent to your mother in a black

box," and "you'll get your black ass kicked" are not adverse actions);
*Bartley v. Collins*, 95-10161, 2006 WL 1289256, at *6 (S.D.N.Y. May 10,
2006) (holding that "verbal threats such as 'we going to get you, you better
drop the suit,' do not rise to the level of adverse action"); *Alicea v. Howell*,
387 F. Supp. 2d 227, 237 (W.D.N.Y. 2005) (holding that "alleged
statements to plaintiff about there being 'no secrets in prison' and that
plaintiff would 'have to pay the consequences' for filing a grievance" do not
constitute adverse action).

Dkt. No. 68, pp. 7-8.


        Likewise, CO Sechrist's refusal to file plaintiff's single grievance does not

constitute legally cognizable "adverse action."  *Crenshaw v. Dondrea*, 278 F. Supp. 3d

667, 670 (W.D.N.Y. 2017); *see also Ross v. Westchester Cty Jail*, No. 10 Civ. 3937,

2012 WL 86467, at *8 (S.D.N.Y. Jan. 11, 2012) (citing *Davis v. Goord*, 320 F.3d 346,

353 (2d Cir. 2003)) (stating that "[a] refusal to file a single grievance is not the kind [of]

retaliatory act which [would] deter a prisoner of 'ordinary firmness' from filing other

grievances").  This conclusion is substantiated by the fact that plaintiff was not deterred

in pressing forward with his claims against the COs by writing the Superintendent and

others and filing suit against the officers, although he was laboring under the false

impression that his grievance had in fact been properly filed.  Because CO Sechrist's

alleged retaliatory conduct was merely *de minimis*, plaintiff's First Amendment retaliation

claim against defendant Sechrist must be dismissed.


**Eighth Amendment Excessive Force Against McGrain, Manwaring, and McAlinn**

        "[W]hen the state takes a person into its custody and holds him there

against his will, the Constitution imposes upon it a corresponding duty to assume some

responsibility for his safety and general well-being."  *Blyden v. Mancusi*, 186 F.3d 252,

262 (2d Cir. 1999).  The Eighth Amendment, which applies to the states through the Due Process Clause of the Fourteenth Amendment, prohibits the infliction of "cruel and unusual punishments" on those convicted of crimes.  U.S. CONST. AMEND. VIII; *Wilson v. Seiter*, 501 U.S. 294, 297-98 (1991). "The Eighth Amendment's proscription of cruel and unusual punishments . . . governs prison officials' use of force against convicted inmates."  *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999).

To prevail on an excessive force claim, a prisoner plaintiff must meet both an objective and subjective element.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Objectively, a plaintiff must show that he suffered a "sufficiently serious" deprivation harmful enough to establish a constitutional violation. *Id.  De minimis* uses of physical force are generally not actionable unless the force used was "repugnant to the conscience of mankind."  *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992).  In this regard, not "every malevolent touch by a prison guard gives rise to a federal cause of action," even if it "may later seem unnecessary in the peace of a judge's chambers . . . ."  *Id.* at 9 (citation omitted).  The absence of an objectively serious injury is "relevant to the Eighth Amendment inquiry but does not end it."  *Hudson*, 503 U.S. at 7.  Put another way, an inmate "who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."  *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010).

Subjectively, the plaintiff must show that the actions taken by prison officials involved the "unnecessary and wanton infliction of pain."  *See Whitley v. Albers*, 475 U.S. 312, 319 (2d Cir. 1986).  "The infliction of pain in the course of a prison

security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Whitley*, 475 U.S. at 319. Rather, the "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7. This inquiry requires the court to consider several factors including: (1) the extent of plaintiff's injury; (2) the need to apply force; (3) the relationship between that need and the amount of force used, (4) the threat "reasonably perceived by the responsible officials," and (5) "any efforts made to temper the severity of a forceful response." *Hudson*, 503 U.S. at 7 (citations omitted).

Plaintiff has presented evidence that CO McGrain threw water on him on the evening of August 30, 2011, and that the following morning, McGrain, Manwaring, and another unidentified officer assaulted him, resulting in a large gash on plaintiff's knee that went untreated for several hours. DOCCS has offered nothing to refute plaintiff's account, arguing, somewhat disingenuously, that McGrain "only threw water on [plaintiff] and left him in a cold cell overnight," and that this force was not sufficiently serious to be actionable. Dkt. No. 65-1, p. 14. This Court does not agree. Plaintiff has presented testimony and medical evidence that he suffered a large cut, approximately 3 & ½ inches by 1 & ½ inches, that bled heavily and that required numerous staples to close, temporary immobilization to ensure that the cut did not reopen, and antibiotics when the wound became infected.

Moreover, DOCCS has offered no evidence to suggest that there was any legitimate need to use force against plaintiff, either on the evening of August 30, 2011 when McGrain threw water on plaintiff or the following morning when McGrain and the other officers kicked, punched, slapped, and threw defendant to the floor. DOCCS' silence on the issue suggests that the COs did not perceive any threat from plaintiff that would justify any use of force against him. Moreover, there is sufficient evidence on this record to suggest that plaintiff was "gratuitously beaten," by McGrain and Manwaring, and that this use of force involved wanton and unnecessary infliction of pain. Regarding the remaining CO McAlinn, whom plaintiff avers stood by and watched while he was beaten, this Court finds that there is a question of fact as to whether he violated his duty "to take reasonable measures to guarantee the safety" of the plaintiff who was in his custody. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer*, 511 U.S. at 832-33). These factual questions preclude summary judgment in favor of defendants McGrain, Manwaring, and McAlinn on plaintiff's Eighth Amendment excessive force claim.

**Eighth Amendment Deliberate Indifference to Medical Need Against McGrain, Manwaring, and McAlinn**

The Eighth Amendment's prohibition against cruel and unusual punishment "may include prison officials' deliberate indifference to an inmate's serious medical needs." *Frank v. Cty. of Ontario*, 884 F. Supp. 2d 11, 17-18 (W.D.N.Y. 2012) (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)). To prove that a defendant's actions or omissions amounted to "deliberate indifference to a serious medical need" in violation of the Eighth Amendment, *Estelle*, 429 U.S. at 106, a plaintiff prisoner must

prove:  (1) the existence of a serious medical need; and (2) the defendant's deliberate indifference to that need.  *Frank*, 884 F. Supp. 2d at 18.

"Deliberate indifference" has both objective and subjective components. *Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991).  Objectively, a medical condition is "sufficiently serious" if it constitutes a condition of urgency that may result in death, degeneration, or extreme pain.  *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Subjectively, plaintiff must show that the defendant acted with a culpable state of mind and intended wantonly to inflict pain.  *Wilson*, 501 U.S. at 299; *DesRosiers v. Moran*, 949 F.2d 15, 19 (1st Cir.1991); *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), aff'd, 970 F.2d 896 (2d Cir.), *cert. denied*, 506 U.S. 1040 (1992).  Deliberate indifference exists when a defendant "knows of and disregards an excessive risk to inmate safety," that is, the defendant "must be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837 (1994).

This Court finds that there is a question of fact as to whether plaintiff's injury, a large cut which bled profusely and required more than 10 staples to close, was sufficiently serious to support a deliberate indifference claim against those officers who refused to take him to the infirmary for over seven hours.[4]  *Chance v. Armstrong*, 143 F.3d 698, 702 (1998) (recognizing that "[a] prisoner who nicks himself shaving obviously does not have a constitutional right to cosmetic surgery," but "if prison officials

---

[4]Plaintiff contends that he was assaulted and injured on his way to breakfast in the early morning and was not allowed to go to the infirmary until after shift change at 3 p.m.  Dkt. No. 87-3, pp. 17, 23

deliberately ignore the fact that a prisoner has a five-inch gash on his cheek that is becoming infected, the failure to provide appropriate treatment might well violate the Eighth Amendment"); *Tiggs v. City of New York*, No. 07CIV.7254(BSJ)(THK), 2009 WL 602991, at *2 (S.D.N.Y. Feb. 24, 2009) (reasoning that "[a]lthough [the] failure to treat an insect bite unto itself likely does not rise to the level of a constitutional violation, failure to timely treat a bite that appears seriously infected—as Plaintiff's bite may have been when he requested and was denied medical attention—could conceivably constitute such a violation").

Depending on the appearance of plaintiff's injury when he requested and was denied medical assistance, he may be able to establish that his medical need was "sufficiently serious" to satisfy the objective prong of the deliberate indifferent test. Moreover, there are questions as to whether the COs involved observed the blood saturating plaintiff's pant leg but denied him access to medical treatment with the intention to wantonly inflict pain on him.  These questions preclude summary judgment. Accordingly, it is recommended that the Motion for Summary Judgment be denied with respect to plaintiff's Eighth Amendment deliberate indifference to medical needs claim as against defendants McGrain, Manwaring, and McAlinn.

## CONCLUSION

For the foregoing reasons, this Court RECOMMENDS that defendant Sechrist's Motion for Summary Judgment or for Judgment on the Pleadings (Dkt. No. 87), be **GRANTED**, and defendant Brasalmann, Manwaring, McAlinn, McGrain, and

Sechrist's Motion for Summary Judgment (Dkt. No. 65) be **GRANTED IN PART** and **DENIED IN PART**, consistent with the foregoing Report and Recommendation.

Therefore, it is hereby ORDERED pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation, and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b)(2) and Local Rule 72.  Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order. *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72 of the Local Rules for the Western District of New York, "written objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection, and shall be supported by legal authority."  Failure to comply with the provisions of Local Rule 72 may result in the District Judge's refusal to consider the objection.

The district judge will ordinarily refuse to consider de novo, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.  *See, e.g., Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).  In accordance with the requirements set forth in Local Rule 72, "[a]ny party filing objections to a Magistrate Judge's order or recommended disposition must include with the objections to the District Judge a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge."

          **SO ORDERED**.

DATED:        Buffalo, New York
              June 19, 2018

                              S/ H. Kenneth Schroeder, Jr.
                              H. KENNETH SCHROEDER, JR.
                              **United States Magistrate Judge**